UNITED STATES of America, Appellee,

v.

John M. MURPHY, Defendant-Appellant.

No. 1428, Docket 83–1087.

United States Court of Appeals,
Second Circuit.

Argued July 13, 1983.

Decided Aug. 8, 1983.

Samuel J. Buffone, Washington, D.C. (Michael E. Tigar, John J. Privitera, Tigar & Buffone, Washington, D.C., on the brief), for defendant-appellant.

Lawrence H. Sharf, Sp. Counsel, Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., Edward A. McDonald, Atty.-in-Charge, Organized Crime Strike Force, Brooklyn, N.Y., on the brief), for appellee.

Before NEWMAN and WINTER, Circuit Judges, and MALETZ, Senior Judge.*

NEWMAN, Circuit Judge:

Former Congressman John M. Murphy appeals from the February 7, 1983, order of the District Court for the Eastern District of New York (George C. Pratt, Judge) [1] denying his motion for a new trial and related relief with respect to his conviction on charges arising out of the Abscam investigation. Murphy's conviction on charges of receiving an unlawful gratuity, 18 U.S.C. § 201(g)(1976), and conspiracy, 18 U.S.C. § 371 (1976), was affirmed by this Court on September 3, 1982, *United States v. Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied sub nom. Murphy v. United States,* — U.S. —, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). For the reasons that follow we affirm the denial of Murphy's motion.

## I.

Murphy was tried along with former Congressman Frank Thompson, Jr.[2] The details of the evidence supporting Murphy's conviction are set out in our prior opinion, *id.* at 832–34, familiarity with which is assumed. In brief, the evidence disclosed that at a meeting on October 20, 1979, undercover agents, posing as representatives of two Arab sheiks, had transferred a briefcase containing $50,000 to Howard L. Criden in Murphy's presence, that pursuant to a prior understanding the conversation at the meeting was conducted in guarded terms, that at one point an undercover agent said that the "money" was just for the two sheiks (in the event that they needed assistance with immigration problems), that Criden had given Thompson $25,000 of the $50,000, of which $15,000 was to be delivered by Thompson to Murphy. The circumstances of the October 20 transaction closely paralleled an October 9 transaction in which a briefcase containing $50,000 was transferred to Criden in Thompson's presence. The evidence also disclosed that Thompson had arranged the October 20 meeting. Included in the evidence, and pertinent to Murphy's new trial motion, was a tape-recorded telephone conversation on October 17 in which Criden assured Melvin Weinberg, an FBI informant, that he would explain to Murphy the "ground rules" for the forthcoming October 20 meeting. This was a reference to instructions Criden had previously received from Thompson that no mention of money was to be made in any meetings between the sheiks' representatives and Thompson or Murphy.

Murphy's new trial motion is based primarily upon testimony given by Criden on September 14, 1982, to a Select Committee of the United States Senate investigating the Department of Justice's handling of the Abscam operation.[3] Criden testified under a grant of use immunity. Murphy relies on passages from Criden's testimony in which Criden denied that he had informed Murphy that money would be transferred at the October 20 meeting or had explained to Murphy any "ground rules" concerning that meeting. This evidence is alleged to undermine the inference the jury was permitted to draw that Criden had explained Thompson's "ground rules" to Murphy, which in turn strengthened the inference that Murphy knew the briefcase contained money and was constructively receiving it when he told Criden to "take care of that" as the briefcase was handed over by the undercover agents. On the basis of Criden's testimony before the Senate Committee, Murphy

---

\* The Honorable Herbert N. Maletz of the United States Court of International Trade, sitting by designation.

1. Judge Pratt, a member of this Court, was sitting by designation in the District Court.

2. We have affirmed Thompson's conviction, *United States v. Myers, supra,* and the denial of his motion for a new trial, *United States v. Thompson,* 710 F.2d 915 (2d Cir.1983).

3. The other items submitted in support of the motion were an affidavit from a linguistics professor and testimony before a House Judiciary Subcommittee by two former federal prosecutors in New Jersey, *see United States v. Thompson, supra,* 710 F.2d at 918. None of the views expressed in these materials warrant the relief sought in Murphy's motion.

sought a new trial, a reopening of the "due process" hearing the District Court had previously conducted to consider constitutional claims, and a hearing to ascertain what Criden had told the prosecutors at an interview conducted at the time of his arrest on February 2, 1980.

The District Court denied Murphy's motion. Applying the traditional test for a new trial motion based on newly discovered evidence, see *United States v. Gilbert*, 668 F.2d 94 (2d Cir.1981), *cert. denied*, 456 U.S. 946 (1982), Judge Pratt concluded that Murphy had not exercised due diligence in seeking Criden's testimony at trial and that there was no probability that the new evidence would lead to an acquittal. He also concluded that there was no basis for believing that the prosecutors were aware of falsity in the tape-recorded statements of Criden that were placed before the jury, thereby rendering inapplicable the less exacting standards for a new trial motion that apply when new evidence indicates that a prosecutor knowingly presented false testimony. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Whether or not Murphy exercised due diligence in endeavoring to secure Criden's testimony during the trial,[4] the District Court was entirely correct in concluding that Criden's Senate Committee testimony would not probably lead to an acquittal upon retrial. Indeed, the extraordinary aspect of the new evidence tendered to indicate Murphy's innocence is that it significantly strengthens the prosecution's case against Murphy. At trial the prosecution had relied on testimony of Ellis Cook, Criden's law partner, to recount Criden's report of giving Thompson portions of the $50,000 payments transferred in Thompson's presence on October 9 and in Murphy's presence on October 20. The defense had contended that Cook was lying. Now Criden testifies directly that he gave portions of both $50,000 payments to Thompson. He also strengthens the Government's contention that Thompson gave part of his share of the October 20 payment to Murphy. Criden testified that he gave Thompson $20,-000 of the October 20 payment "and he [Thompson] said he would take care of Congressman Murphy . . . ."[5] Law Enforcement Undercover Activities: Hearings Before the Select Committee to Study Law Enforcement Undercover Activities of Components of the Department of Justice, 97th Cong., 2d Sess. 667 (statement of Howard L. Criden) (hereinafter "Senate Hearings").

The only respect in which Criden detracts from the force of the prosecution's trial evidence is his denial that he had conveyed the "ground rules" for the October 20 meeting to Murphy. However, he more than makes up for that loss by solidifying the prosecution's evidence that Thompson himself had given Murphy the "ground rules." At trial the prosecution had strong evidence to this effect in a videotape of the October 9 meeting in which Thompson says, after the $50,000 has been transferred, that he will bring other Congressmen, that the first one he would bring would be his "pal" from New York, meaning Congressman Murphy, and that he would "brief" his "pal" beforehand. *United States v. Myers, supra,* 692

---

**4.** Judge Pratt ruled that Murphy had not exercised due diligence in securing Criden's testimony since he had failed to subpoena Criden as a trial witness. Criden had been indicted with Thompson and Murphy, but his trial had been severed. Early in the *Thompson-Murphy* trial, in response to inquiry by Murphy's counsel, the prosecutor indicated that he would consider granting use immunity to Criden if the defense called Criden as a witness. The parties are in dispute whether defense counsel next explored the possibility of immunity for Criden late in the trial but before the close of evidence, as Murphy's counsel contends, or not until after jury deliberations had begun, as the Govern-

ment contends. In view of our disposition of the appeal, we need not resolve this dispute nor determine the circumstances under which subpoenaing a witness at trial may be necessary to establish due diligence in securing that witness's testimony offered in support of a motion for a new trial.

**5.** Earlier in his testimony, in reference to alleged payments by Angelo J. Errichetti to undercover agents, Criden had said that he understood Erichetti's statement that he would "take care of" them to mean "give some of the money" to them. Senate Hearings at 645.

F.2d at 833. To this evidence Criden now adds that Thompson told him that he had "made the necessary arrangements with Congressman Murphy," Senate Hearings at 669, and that "Congressman Murphy clearly understood the situation, and was ready to go to a meeting with the sheik," *id.* There is simply no realistic possibility that an acquittal might result because the "ground rules" were conveyed to Murphy solely by Thompson, instead of by both Thompson and Criden, as it previously appeared. On the contrary, the added evidence that Thompson conveyed the "ground rules," that he received cash, and that he said that he would "take care" of Murphy strengthens the case against Murphy.

Perhaps sensing the untenable nature of his position, Murphy resorts to an audacious claim. At a new trial, he contends, he would abandon his strategy at the trial of claiming that he was the innocent dupe of a scheme concocted by Criden to make it appear that Murphy was receiving money and, instead, claim that it was really Thompson who had duped him. Understandably not explained is any plausible basis on which a jury that was unpersuaded that Murphy was duped by Criden, whom he barely knew, could possibly believe that Murphy was duped by Thompson, his "pal" and colleague in the House of Representatives for many years. It is simply preposterous to think that Thompson, who boldly discussed with Congressman Murtha the prospect of receiving $50,000 in "walking around money" for helping the sheiks on immigration matters (an offer Murtha declined), *see United States v. Myers, supra,* 692 F.2d at

834, would engineer an elaborate plot to make it appear that Murphy was accepting $50,000, leave Murphy uninformed, and then pocket Murphy's share.[6] By any standard, the new evidence does not warrant a new trial.[7]

Nor was there any basis for reopening the "due process" hearing or probing the prosecutors' knowledge of what Criden had said to them on February 2, 1980. If, as Criden testified before the Senate Committee, he misled the undercover agents in October 1979 into thinking that Murphy had told him that Murphy would accept a payment, there is no basis for thinking that the agents were then aware of any deception on Criden's part. Equally unavailing is the argument that Criden's current disavowal of having conveyed the "ground rules" to Murphy strengthens a due process claim based on the Government's allegedly deliberate creation of ambiguities in its approach to Murphy. *See United States v. Myers, supra,* 692 F.2d at 843–45. As we have previously ruled, *id.* at 845, the Government was entitled to observe the defendants' "ground rules," and Criden's Senate testimony simply confirms that the "ground rules" were devised and communicated to Murphy by Thompson.

Murphy seeks to question the prosecutors to determine whether they learned from Criden in their February 2, 1980, interview of him that, as he now tells the Senate Committee, he did not convey the "ground rules" to Murphy. He seeks to show that the prosecution made a false argument to the jury by suggesting, based on Criden's

---

6. At trial Murphy had advanced the theory that he had been duped by Thompson and Criden, working together. Judge Pratt explicitly placed this defense contention before the jury, which obviously rejected it.

7. In view of the total inadequacy of the new evidence to warrant a new trial, we need not determine whether the new evidence is to be assessed for its tendency to result in an acquittal at the new trial Murphy hopes to secure, as he contends, or for its tendency to have resulted in an acquittal if introduced at the trial that occurred, as the Government contends. *Compare United States v. Polisi,* 416 F.2d 573, 577 (2d Cir.1969) (new evidence must be of such

nature that "it would probably produce a different verdict in the event of a retrial"), *with United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976) (new evidence must be of such nature that it "probably would have resulted in acquittal"). Murphy considers the prospective assessment more favorable to him since at a new trial he would be tried alone and would benefit from his acquittal on the bribery charge. *See United States v. Myers, supra,* 692 F.2d at 828. Whether assessed prospectively or retrospectively, the new evidence does not remotely warrant a new trial.

recorded telephone conversation with Weinberg on October 17, that Criden had briefed Murphy. The claim is attenuated at best since the key point made to the jury—that Murphy knew the "ground rules"—remains undiminished, in fact, strengthened by Criden's new testimony. In any event, prior to trial the prosecutors gave Murphy's counsel a draft affidavit prepared for Criden's signature, which set forth the substance of what Criden had told the prosecutors. Under the circumstances, Murphy has shown no sufficient basis for a hearing to probe for additional details that the prosecutors may have learned from Criden.

The District Court was entirely warranted in denying Murphy's motion for a new trial and related relief. The order appealed from is affirmed.